Albert HUGHES

v.

SACO CASTING CO., INC.

No. 81–266–Appeal.

Supreme Court of Rhode Island.

April 14, 1982.

Robert C. Hogan, Daniel R. Sumner, Warwick, for petitioner.

Roberts, Carroll, Feldstein & Tucker, Bruce G. Tucker, James T. McCormick, Providence, for respondent.

OPINION

KELLEHER, Justice.

This is an employee's appeal from a decree of the appellate division of the Workers' Compensation Commission affirming the trial commissioner's denial of the employee's petition for compensation benefits, in which he alleged a total loss of earning capacity due to work-related injuries. Hereinafter we shall refer to the employee as Hughes and to his employer as Saco.

In his November 1979 petition for benefits, Hughes alleged that (1) he had injured himself when he slipped and fell on a wet

floor as he was performing his chores as a tub-machine operator at Saco's plant, (2) the fall occurred on September 1, 1978, (3) he immediately notified the owner's son of the episode, (4) he received emergency treatment at Rhode Island Hospital on the same day, (5) injuries to his back, coccyx, and right leg prevented him from reporting for work for an indefinite period beginning as of September 2, 1978, and (6) dependency benefits were due him for the benefit of his wife and his daughter, Kimmie. Later, when the petition came on for hearing before the trial commissioner, the petition was amended to include a dependency claim for two stepsons. Hughes had been working at Saco for about two and one-half months prior to his fall. As will be seen, the contents of the many documents introduced at the hearing before the trial commissioner and the testimony presented at that time have combined to cast a large shadow of uncertainty and doubt as to the genuineness of the allegations contained in the November 1979 petition.

In early January 1979, Hughes and Saco entered into a nonprejudicial agreement[1] calling for weekly compensation benefits of $73.33. The agreement described Hughes's injury as a contusion of the sacrum and a lower-back strain. The agreement lists the date of injury as September 1, 1978, and notes that Hughes did not leave the job until ten days later, on September 11.

A report prepared by Rhode Island Hospital's emergency department is also an exhibit. The report, dated September 1, 1978, indicates that Hughes told hospital officials that he had fallen two days earlier (August 30, 1978) and that he complained of pain in the lower back. The report indicates that X rays taken of the sacrum and coccyx disclosed "[n]o fracture or dislocation or other abnormality is shown."

Another exhibit in the record is a duplicate original of a March 30, 1979 petition for compensation benefits filed on Hughes's behalf by a law firm other than the one presently representing him. In the March 1979 petition Hughes sought benefits from Saco for injuries to his back and neck sustained when he slipped on a wet floor on February 1, 1979. This petition lists as Hughes's treating physicians Dr. John Hayes of Warwick and Dr. Theodore Gibson of Providence. At this time Hughes was seeking dependency benefits only for the two stepsons.

At the hearing, Hughes conceded that the two stepsons were not actually his children but those of his wife and that the boys were living in North Carolina. Hughes's adoption of the two had not been effectuated.

The sole medical testimony presented at the hearing was that of an orthopedic surgeon, Dr. Stanley Stutz. Doctor Stutz told the trial commissioner that he first examined Hughes on November 30, 1979. Hughes, he said, had a history of back problems, including a surgical removal of a disc sometime in 1973–74. Doctor Stutz diagnosed Hughes's ailment as a chronic inflammation of the nerves situated in the upper portion of the sacrum and a "paralumbar muscle strain." The orthopedist classified Hughes as partially disabled in that he could work but could not perform any duties involving heavy lifting or extended periods of sitting or repetitive bending. He attributed the disability to the "incident in question," but when cross-examined Dr. Stutz checked his notes, which indicated that Hughes's back had been aching since February 1978. The doctor's report, which is in evidence, indicates that Hughes had been working up until September of 1979. The pain, according to Dr. Stutz, had been

1. A nonprejudicial agreement is authorized pursuant to the provisions of G.L. 1956 (1979 Reenactment) § 28–35–8. It allows payment of compensation benefits to an employee for a period not to exceed three months while the employer investigates the claim. Payments made during this period are without prejudice to either the employee's or the employer's pursuit of his various interests so far as the employer's liability for compensation is concerned.

present prior to the fall, but the 1979 fall had probably aggravated the condition. Later, on redirect examination, the witness made it clear that if Hughes's fall had occurred in 1978 rather than 1979, he would modify his diagnosis only to the extent of omitting any reference to the muscle strain.

A fellow employee of Hughes's, John Jiminez, appeared at the hearing and explained that he could not have witnessed Hughes's fall because he did not work at all the week of September 1, 1978.[2] A supervisor at Saco was another witness, and he explained that Hughes came to him on September 1, 1978, and asked to borrow his car so that he could go to the hospital. At that time Hughes told the supervisor that he had slipped and fallen. When Hughes returned to work, he told the supervisor he had a "chipped bone in his hip or something."

In urging us to sustain his claim for compensation, Hughes argues that the denial of his petition flies in the face of the uncontradicted testimony of Dr. Stutz, who insisted that Hughes's inability to work was attributable to a fall, regardless of whether the fall's vintage was 1978 or 1979. In taking this position, Hughes certainly lacks a firm understanding of the rule concerning the evaluation of uncontradicted evidence, and he fails to appreciate our role as fact-finders in compensation disputes.

■ In speaking of the effect to be given uncontradicted testimony, this court has recognized that a judge or one acting in a quasi-judicial function may not reject uncontradicted testimony arbitrarily. Positive, uncontradicted evidence, we have said, may be rejected if it contains inherent improbabilities or contradictions that alone or in connection with other circumstances tend to contradict it. Such testimony may also be disregarded on credibility grounds as long as the factfinder clearly but briefly states the reasons for rejecting the witness's testimony. *Correia v. Norberg*, R.I., 391 A.2d 94 (1978); *Peloso v. Peloso, Inc.*,

107 R.I. 365, 267 A.2d 717 (1970); *Laganiere v. Bonte Spinning Co.*, 103 R.I. 191, 236 A.2d 256 (1967); *Walsh-Kaiser Co. v. Della Morte*, 76 R.I. 325, 69 A.2d 689 (1949).

■ Our role as factfinders in workers' compensation proceedings is almost nil because the General Assembly has vested this function in those who work either as trial commissioners or as members of the commission's appellate division. *Bagaglia v. Bud Industries*, R.I., 438 A.2d 667, 670 (1981). Again, in *Allen v. Henry Evers, Inc.*, R.I., 437 A.2d 1089, 1090 (1981), we emphasized that our review is limited to the actions of the appellate division, and its factual findings in the absence of fraud are conclusive and may not be disturbed on appeal if there is any competent evidence supporting the findings. It should also be noted that in prosecuting his November 1979 petition, Hughes assumed the burden of establishing a nexus between the 1978 injuries described in that petition and the resulting loss of income. *Lussier v. American Textile Co.*, 110 R.I. 299, 292 A.2d 226 (1972).

It is obvious that the appellate division was well aware of the principles to which we have just alluded. The division was confronted with a record that contained a welter of inconsistencies. The appellate division, in picking and choosing among the inconsistencies that abounded at the hearing before the trial commissioner, relied on the records maintained by the Rhode Island Hospital's emergency unit and found that Hughes had fallen while washing jewelry at Saco on August 30, 1978. The division noted the fifteen-month gap between Hughes's emergency-room visit and his consultation in November 1979 with Dr. Stutz and, after commenting on Hughes's attempt in one petition to seek compensation for his September 1, 1978 injuries while earlier seeking compensation for an alleged February 1, 1979 mishap, came to the conclusion that the injuries treated by Dr. Stutz were in no way related to the August 30, 1978 fall.

2. September 1, 1978, fell on a Friday.

It is our belief that in taking this approach the appellate division was well within its rights when it commented that Hughes had failed to prove to the division's satisfaction all of the pertinent allegations of his claim. In other words, Hughes had failed to persuade the commission that his 1978 fall was responsible for the partial-disability diagnosis subsequently made by Dr. Stutz. Having in mind that the record presented to the appellate division wallowed in the seas of inconsistency and contradiction, the appellate division's conclusions are amply justified.

Hughes's appeal is denied and dismissed, the division's decree of dismissal is affirmed, and the case is remanded to the Workers' Compensation Commission.