**STATE**

v.

**Michael MORRIS.**

**No. 96–513–C.A.**

Supreme Court of Rhode Island.

Jan. 31, 2000.

852

Annie Goldberg, Aaron L. Weisman, Providence, for Plaintiff.

Marie T. Robuck, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In this case, a Superior Court trial jury found the defendant Michael Morris guilty on indictment charges of conspiracy to commit burglary, assault with a dangerous weapon and unlawful concealment of a knife.[1] Following denial of his motion for a new trial, he was sentenced on each of the convictions. He then was adjudged by the trial justice to be an habitual criminal and sentenced on that adjudication. He appeals.

The defendant in his appeal asserts multiple trial errors on the part of the trial justice, as well as prosecutorial error on the part of the state's prosecutor. He alleges that the trial justice erred in denying his request for funds to enable him to procure and retain a defense eyewitness expert; erred by refusing to suppress identifications made of him by witnesses from a photo array and lineup; erred by refusing to grant his request for a mistrial; and finally, erred in instructing the jury with respect to the firearm charge. As regards the state's prosecutor, the defendant alleges that he improperly solicited and presented testimony from the victim that served to bolster the victim's own testimony. Lastly, the defendant challenges his post-trial adjudication as an habitual criminal, claiming that the trial justice failed to afford him a separate trial or hearing on that particular issue.

For the reasons hereinafter set out, we affirm the judgments of conviction, as well as the habitual criminal adjudication.

1. The trial jury was unable to agree upon a verdict on a fourth count of carrying a pistol

## The Case Facts

On November 7, 1994, Martin Harris (Harris), an attorney whose practice includes criminal defense cases, was enjoying a relaxing respite in an upstairs room at his home in Cranston, while his two stepchildren, Derrick (age twelve) and Ericka (age ten), along with two of their friends, David (age twelve) and Ryan (age twelve) were watching television downstairs. The front doorbell sounded. The four children ran to the front door area from which they were able to observe through an untinted double glass front door a male person standing on the front porch. At about the same time, Harris was coming down a stairway leading to the front door, apparently in response to the sounding of the doorbell. Upon observing the children and the person standing on the porch, he cautioned them not to open the door. When Harris reached the door, he opened it and inquired of the person's business. The person mumbled something about his looking for "Glenn, or Mr. Miller, or Bill." Harris told him that no one fitting that description resided there, whereupon, the person turned and began to walk away.

Suspicious, and still unclear about exactly what the person wanted, Harris unfortunately went outside to inquire further. When he did, the person turned and calmly approached Harris. Without any warning, he grabbed Harris and put a knife to Harris's throat. The two struggled until Harris lost his footing and both fell into a garden mulch bed. The assailant, who was still wielding the knife, fell on top of Harris and cut him on the face several times.

Ericka, David and Ryan, startled by what was occurring, remained in the hallway area, from where they witnessed what was happening to Harris. Derrick, however, ran to a nearby telephone and dialed 911 for assistance. Ericka then also ran to

without a license.

another room and began to dial 911 on another telephone. As she was doing so, a second person burst into the room. This person, brandishing a handgun and wearing a black ski mask and gloves, put the gun to Ericka's head and pulled away the telephone. Ericka, terrified, bolted from the room. The gunman then turned his attention toward Derrick, who quietly and quickly hung up the telephone that he was using. Just then, the person who had been struggling outside with Harris reentered the house and shouted to the gunman: "Come on, let's go, he got away." Apparently, he was referring to Harris, who by now had run from the property. The two intruders fled from the house. Derrick, Ericka and Harris then observed a black Nissan Pathfinder drive from the house area at a high rate of speed.

Within five to ten minutes after the 911 report of the home invasion, a description of the vehicle and plate number was given to the police. This information was broadcast over the police broadcast system. Cranston city Patrolman Thomas Martin (Martin), aware of the police radio broadcast of the home intrusion, recognized the suspect vehicle as it passed by him. He turned his police cruiser, and started in pursuit of the Pathfinder. During the chase, Martin radioed for assistance. While doing so, he observed a man in the fleeing vehicle point a gun at him from the rear of the Pathfinder. Martin then broadcast a warning to other police officers who might be responding to his radio call for assistance to proceed with caution.

Meanwhile, at another location, Patrolman Alan Davis (Davis), responding to Martin's call, placed his police cruiser in the roadway in which the Pathfinder was traveling, in an attempt to block the roadway and force the driver of the Pathfinder to stop. The driver of the Pathfinder, however, was able to maneuver around Davis' parked police cruiser. Davis testified that as the Pathfinder drove by him he was able to get "a very, very, very good look" at the driver. Davis then joined in the police chase. Eventually, the driver of the Pathfinder lost control of the vehicle, which then plowed through a cornfield and crashed through a stone wall before finally coming to a stop. Three occupants then jumped from the vehicle and fled the scene by foot. An all-out police manhunt ensued. Hours later, one of the men, the defendant, was captured that night while attempting to conceal himself in some woodlands. At the time of his capture, he was described as being scratched, dirty and covered with leaves. Martin identified him as the man who had pointed the gun at him from the rear of the Pathfinder during the police chase.

The following day, another man, the co-defendant, Patrick Kilburn (Kilburn), was arrested. Officer Davis identified him as being the driver of the Pathfinder. A third man, Michael Lopez, whose fingerprints were found in the Pathfinder, was later arrested on the basis of statements that Kilburn had made to the police.

The police then conducted a search of the crime scene area. They found a white cloth garden glove and a light gray blood stained sweatshirt bearing the words "BOSS America." Harris had previously told the police that the man who had accosted him was wearing a light colored sweat top with what he believed were the words "BONN America" written on its front. Blood stains found on the sweatshirt later were tested and found to match Harris' blood type.

A search of the Pathfinder produced a white glove that appeared to match the white glove found at the crime scene, various other gloves, a black ski mask and a black zippered sweatshirt. A knife, later identified by Harris as being the knife used by the person who had attacked and cut him, was also found in the Pathfinder. We take up and address each of the defendant's appellate contentions.

# I

## Funding for Eyewitness Experts

The defendant asserts that the trial justice committed reversible error when he

refused to authorize public funding for the retention of an eyewitness testimony expert. He maintains that because eyewitness identification was to be a crucial element in the state's case, he should have been permitted to explore the unreliability of such testimony through the use of an eyewitness expert who he believes would have testified about how eyewitness testimony could be influenced by the effects of stress relative to perception, weapon-focus-attention variables, and witness perception. He additionally asserts that because of the lack of an eyewitness expert, his defense counsel was prevented from effectively preparing for trial and from effectively representing him during trial. Pursuant to Rule 403 of the Rhode Island Rules of Evidence, the trial justice denied the defendant's request. He reasoned that the proposed eyewitness expert's opinion testimony would not be admissible at trial and would, if admitted, only tend to confuse the jury. We agree with that finding.

■ Although an indigent defendant may be entitled to public funding to retain experts "necessary for an adequate defense," *Ake v. Oklahoma,* 470 U.S. 68, 76, 80, 105 S.Ct. 1087, 1094, 84 L.Ed.2d 53, 64 (1985), the actual admissibility of any particular proposed expert testimony should, of course, be addressed in the first instance by the trial justice.

■ "It is well settled that questions regarding the admissibility and relevancy of evidence are left to the sound discretion of the trial justice." *State v. Greene,* 726 A.2d 471, 473 (R.I.1999) (order). "This Court will not reverse a determination of relevance absent a showing that the trial justice has clearly abused his or her discretion." *Id.*

In *State v. Porraro,* 121 R.I. 882, 892, 404 A.2d 465, 471 (1979), this Court long ago determined that "the trustworthiness in general of eyewitness observations, [is] not beyond the ken of the jurors." We stated that:

"[t]hrough cross-examination, defense counsel was able to probe into the witness' capacity and opportunity for observation, her attention, interest and distraction. The jury was perfectly capable of assessing the witness' credibility by weighing the inconsistencies and deficiencies elicited in cross-examination." *Id.* at 893, 404 A.2d at 471.

In *State v. Gomes,* 604 A.2d 1249 (R.I. 1992), we once again concerned ourselves with the admissibility of eyewitness expert testimony. There, we stated that the "presentation of expert testimony concerning the unreliability of eyewitness identification would lead to confusion of the issues and mislead the jury." *Id.* at 1256. In addition, we stated that "[t]he expert's blanket assumptions concerning eyewitness identification under stressful situations would not be appropriate" in a situation where several witnesses observed a gunman from different angles and under different conditions of stress. *Id. See also State v. Sabetta,* 680 A.2d 927, 933 (R.I. 1996) (upholding the exclusion for similar reasons). In *State v. Gardiner,* 636 A.2d 710 (R.I.1994), we also upheld the exclusion of eyewitness expert testimony when the trial justice, after a lengthy voir dire, determined that the proposed testimony would not be relevant.

■ In the present case, the trial justice, citing *Porraro* and *Gomes,* as well as his own personal "disastrous experience" in a previous trial in which he had admitted eyewitness expert testimony, stated that "[b]ased on the little experience I have had within one case, and based on the *Porraro* case and the *Gomes* case, and Rule 403 I'm satisfied that the motion should be denied, and I do deny it." Because the trial justice determined that the proposed expert testimony in this case would not be admissible at the defendant's trial, he did not err in denying the defendant's motion to obtain public funding for the retention of an eyewitness expert.

■ The defendant's ancillary assertion, that denial of such funding inhibited his

preparation of an effective defense at trial, has no merit. A review of the record reveals that defense counsel was permitted to extensively cross-examine all the state's witnesses on the reliability of their identification of the defendant. The trial record additionally reveals that each witness, when cross-examined, remained steadfast in his or her recollection of whom they had seen invading the Harris residence and that those well tested recollections were all accepted by the trial jury.

## II

### Motion to Suppress

#### (a) The Photographic Array

■ The defendant asserts that the photographic array was unduly suggestive because his photograph appeared to be the only "black and white" one in the array. He contends that the trial justice erred when he refused to suppress the identifications made from the array. In addition, he asserts that Derrick and Ericka had identified him only after first hearing suggestive comments made to the police by their stepfather, Harris.

The record discloses that on the day following the home invasion, Harris went to the police station to view a photographic array. At that time, he picked out the defendant's photograph because of its similarities to his assailant, and he requested a lineup to insure his making a positive identification. Later that day, a police detective visited the Harris household to show various photographs to Harris's stepchildren. Both children, Ericka and Derrick, at that time immediately and almost simultaneously picked out the defendant's photograph. It was during this period, and in the presence of the children, that Harris again mentioned to the police that the defendant's photograph bore similarities to the assailant. The defendant asserts that Harris's offhand comment tainted the out-of-court identifications made by the children. That assertion is based upon mere conjecture and is otherwise unsupported

by the trial record. We note, also, that on separate occasions, the other two children, Ryan and David, each had independently picked the defendant's photograph from the array.

■ In reviewing a trial justice's decision on a motion to suppress, "the duty of the reviewing court is to view the evidence in the light most favorable to the government and apply the 'clearly erroneous' rule." *State v. Gatone*, 698 A.2d 230, 235 (R.I.1997) (quoting *Gomes*, 604 A.2d at 1253).

With respect to the use of suggestive photographic arrays, this Court previously has stated that:

> "In determining whether the photographic array poses a substantial risk of misidentification, we must 'compare the physical characteristics of each individual featured in the display to the general description of the suspect given to the police by the victim.' * * * If we conclude that the array was unnecessarily suggestive, we must then consider whether 'in the totality of circumstances' [the witness's] out-of-court identification of defendant was nonetheless reliable." *Gatone*, 698 A.2d at 235–36.

In denying the defendant's motion to exclude the photographic identifications in the instant case, the trial justice stated that although the defendant's photograph was "certainly not as vivid a color photo as the others," that "[o]f the individuals in the photo pack[,] six of them are reasonably alike by way of appearance and age and hair." The trial justice then determined that he was "satisfied that this photo spread is not at all inherently or in any way suggestive."

With respect to the out-of-court identification of the defendant made by Derrick and Ericka, the trial justice determined that "on balance, after listening to each of these youngsters testify * * * each of them certainly had ample opportunity to view the man at the door." He found that: "the area [wa]s well lit;" and that the door

"was all glass, not tinted." He noted that they "looked at the man through the door for several seconds" and that "[t]hey had full view." He stated that not only did they have "an opportunity to view this fellow, they also certainly were focused on him." He observed that "[e]ach of these youngsters was certain in their identification," that the identification "was made shortly after the offense occurred," and that "each of these two youngsters reached the same opinion virtually simultaneously." The trial justice then concluded that Harris's comments "did not dissuade those youngsters one iota from backing off their identification. They were confident, and remained so."

In viewing the totality of evidence in this case, we conclude that the trial justice did not err in denying defendant's motion to suppress the out-of-court identifications resulting from the photographic array.

**(b) The Lineup**

■ The defendant next contends that the trial justice erred in failing to suppress Harris's identification of the defendant at the physical lineup. He asserts that the lineup was suggestive because Harris was expecting to see him in the lineup and that like in the photographic array, he was assigned in the lineup as number three, and his orange shirt made him stand out from the others in the lineup. These assertions have no merit.

■ Although we apply a clearly erroneous standard to the trial justice's findings of historical fact, we determine de novo, however, whether the lineup identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *State v. Austin,* 731 A.2d 678, 681 (R.I.1999) (quoting *Manson v. Brathwaite,* 432 U.S. 98, 105 n. 8, 97 S.Ct. 2243, 2248 n. 8, 53 L.Ed.2d 140, 148 n. 8 (1977)). In making this determination, we must consider factors such as:

"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his [or her] prior description of the criminal, the level of certainty demonstrated at the confrontation [identification procedure], and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Austin,* 731 A.2d at 682 (quoting *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154).

In addition, it must be remembered that this Court has "never required that lineups be composed of near identical people, but only that line-up members be 'reasonably similar.'" *Austin,* 731 A.2d at 682 (quoting *State v. Cline,* 122 R.I. 297, 327, 405 A.2d 1192, 1208 (1979)). *See also State v. Walker,* 667 A.2d 1242, 1248–49 (R.I. 1995) (lineup not suggestive where suspect was the only member with white pants and the victims previously had described the intruder as wearing white pants).

In the present case, the trial justice found that

"every man in this line up has dark hair, each one of them appears to have some facial hair. They all appear to be the same age, thereabouts. In fact, from the photograph [of the lineup], the middle three individuals look very much alike. There is nothing strange or dissimilar about [the defendant] vis-a-vis the others in the line-up. It's a very fair line-up. The fact that he happens to be wearing an orange shirt is of no moment to me. * * * [E]ven if [the procedure] can somehow constitute a suggestive practice, there's no question in my mind that Martin Harris had an independent and clear recollection of the man with whom he struggled on the porch and mulch bed of his house."

The trial justice additionally noted that Harris had been "face to face" with the defendant "for a period of time," had an "opportunity to view him," and was "reasonably accurate in his description." He stated that "[t]he time between the offense

and confrontation was not long at all" and that his "level of certainty at the time of identification was 100 percent."

In applying a clearly erroneous standard of review to the trial justice's findings of historical facts, and following our de novo review of the lineup-identification evidence in this case, we conclude therefrom that the trial justice did not err in admitting Harris' identification of the defendant made at the police lineup.

## III

### The Mistrial Motion

During opening statements, the prosecutor alluded to the fact that the defendant had pointed a gun at police officer Martin from the rear of the Pathfinder while it was being pursued. The defendant objected and made a motion for a mistrial or, alternatively, for a curative instruction. The basis for the objection was that the grand jury had failed to return a true bill on a related charge of assault upon a police officer with a firearm and that the trial justice had previously dismissed another charge of committing a crime of violence while armed with a firearm. Essentially, the defendant was objecting to the introduction of that evidence for reason that it referred to other distinct uncharged substantive offenses. The trial justice denied the objection, stating that the prosecutor's statement was made with reference only to the evidence that would be introduced by the state in support of its then existing and present trial charge against the defendant for unlawfully carrying a pistol without a license.

The proper function of an opening statement is not to introduce actual evidence into the trial; rather, "it is to apprise the jury with reasonable succinctness what the issues are in the case that is about to be heard and what evidence the prosecution and the defense expect to produce at trial in support of their respective positions." *Avarista v. Aloisio,* 672 A.2d 887, 892 (R.I.1996) (per curiam) (quoting

*State v. Byrnes,* 433 A.2d 658, 664 (R.I. 1981)). General Laws 1956 § 11-47-8(a) states: "No person shall, without a license or permit, issued as provided in §§ 11-47-11, 11-47-12 and 11-47-18, carry a pistol or revolver in any vehicle or conveyance or on or about his or her person whether visible or concealed * * *." "When the state prosecutes a defendant, it carries the burden of proving every element necessary to the charge beyond a reasonable doubt * * *." *State v. Bettencourt,* 723 A.2d 1101, 1108 (R.I.1999) (quoting *State v. Mora,* 618 A.2d 1275, 1280 (R.I.1993)).

The defendant here was charged with and was being tried upon a charge of unlawfully carrying a pistol without a license. It was incumbent upon the prosecutor to prove every element of that charge at trial. The prosecutor, in his opening to the trial jury, had every right to outline, in good faith, the evidence that the state intended to present in support of that charge, as well as the remaining charges, being tried to the jury. *See State v. Ware,* 524 A.2d 1110, 1112 (R.I.1987). Consequently, the trial justice did not err in overruling the defendant's objection to the prosecutor's opening statement.

## IV

### Miscellaneous Issues

The defendant also asserts that the prosecutor improperly invited testimony from Harris in the course of direct examination. He contends that by asking Harris leading questions, the prosecutor enabled Harris to frame his responses so he could improperly vouch for his own testimonial credibility. In addition, the defendant requests this Court to revisit its holding in *State v. Holland,* 430 A.2d 1263 (R.I.1981). There, we held that there is no Sixth Amendment right to counsel at a police lineup conducted before the initiation of formal criminal charges. *Id.* at 1272.

According to our well-settled "raise or waive" rule, issues that present

themselves at trial and that are not preserved by a specific objection at trial, "sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal." *Bettencourt*, 723 A.2d at 1107 (quoting *State v. Toole*, 640 A.2d 965, 972–73 (R.I.1994)). "Another basic rule of our appellate practice is that this court will not review objections that were not raised at trial." 723 A.2d at 1107. " 'Consequently, allegations of error committed at trial are considered waived if they were not effectively raised at trial, despite their articulation at the appellate level.' " *Id.* at 1107–08.

■ With respect to the defendant's contentions that the prosecutor improperly solicited and presented bolstered testimony from Harris and improperly vouched for his testimony, the defense counsel raised only a general objection. Because the defendant failed to properly object below, that issue has not been preserved for appeal.

■ As regards the defendant's request that this Court revisit *Holland*, we reiterate that "[i]t is axiomatic that 'this [C]ourt will not consider an issue raised for the first time on appeal that was not properly presented before the trial court.' " *State v. Saluter*, 715 A.2d 1250, 1258 (R.I.1998) (quoting *Gatone*, 698 A.2d at 242). Because defendant did not raise this issue at his trial below, it is not now properly before us.

■ Finally, the defendant asserts that he was denied due process and equal protection under the law when the trial justice adjudged him to be an habitual offender without first affording him a separate hearing to determine in fact whether he was an habitual offender. "[I]n the absence of 'extraordinary circumstances,' this Court will not consider the validity or the legality of a sentence on direct appeal." *Bettencourt*, 723 A.2d at 1114 (quoting *State v. Collins*, 679 A.2d 862, 867 (R.I. 1996)). " '[T]he proper procedure for a

review of a sentence begins in the Superior Court under Rule 35 of the Superior Court Rules of Criminal Procedure.' " *Id.*

■ The defendant's due process and equal protection contentions relating to the imposition of his enhanced sentence after he had been determined by the trial justice to be an habitual criminal are devoid of merit. He misconceives the purpose and intent of G.L.1956 § 12–19–21. That statute does not create a separate substantive offense requiring a separate trial. *See State v. Campaniello*, 474 A.2d 1247, 1247 (R.I.1984) (per curiam). Proof of two prior felony convictions and sentences imposed thereon would suffice as prima facie evidence that would support the trial justice's determination that the defendant was an habitual criminal and would permit the trial justice to impose sentence upon the defendant.

■ The habitual criminal statute made the defendant subject to its enhanced sentence feature as an habitual criminal simply upon prior notification to him by the Attorney General, given within forty-five days of his arraignment, or at any time before the date of his pretrial conference, that he would, if convicted on his pending charge or charges, be thereafter presented to the trial justice for sentencing as an habitual offender. Upon that presentment, after his conviction, and the state's proof that he had been previously convicted of two or more felonies and had been sentenced on those convictions, the trial justice, at the sentencing proceeding was then permitted to sentence him as an habitual criminal. The record reveals that the defendant was present at the sentencing proceeding where he had an opportunity to be heard, and did not object to the proceeding. Consequently, no state or federal due process, or equal protection violation, occurred in the course of the habitual criminal sentencing procedures utilized in this case. *See State v. Tregaskis*, 540 A.2d 1022 (R.I.1988).

In the instant case, the defendant has not sought revision of his sentence in the Superior Court and has not demonstrated to us that there exists any extraordinary circumstance that would warrant our review of his sentence at this time on direct appeal. Consequently, his appeal on this issue is dismissed without prejudice to his seeking whatever relief from his sentences that he believes himself entitled to pursuant to Rule 35 of the Superior Court Rules of Criminal Procedure. *See Bettencourt,* 723 A.2d at 1114.

## Conclusion

For the foregoing reasons, the defendant's appeal is denied. The judgments of conviction are affirmed, and the papers in this case are remanded to the Superior Court.