STATE

v.

**John R. RIEGER.**

No. 98–322–C.A.

Supreme Court of Rhode Island.

Jan. 5, 2001.

Jane M. McSoley, Aaron L. Weisman, Providence, For Plaintiff.

John A. MacFayden, 3rd, Robert E. Craven, Providence, For Defendant.

Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on appeal from a Superior Court judgment of conviction in which the defendant, John R. Rieger, was found guilty of assault with a dangerous weapon. The defendant contended that the trial justice erroneously denied his motion for a new trial or alternatively, his motion for judgment of acquittal. He further argued that the testimony by police expressing an opinion on the defendant's truthfulness and the testimony by the state medical examiner concerning ballistics were erroneously admitted into evidence. After considering the defendant's arguments and carefully reviewing the entire record, we deny the appeal and affirm the judgment of the Superior Court.

### Facts and Procedural History

On February 5, 1995, a bizarre series of events occurred after an unfortunate chance encounter between one Russell Chatelle (Chatelle) and defendant, which resulted in a shooting that inflicted serious injury upon Chatelle. The facts are undisputed, except for the circumstances immediately surrounding the shooting. Chatelle spent most of the afternoon at Pete's Pizza Plus in Coventry, Rhode Island, watching Jean Claude Van Damme movies and drinking beer. By the time defendant arrived, Chatelle had consumed a full pitcher that held just under five twelve-ounce cups and had just ordered a sandwich and a second pitcher. Earlier that afternoon, defendant had watched a movie with his wife while drinking two beers. The defendant, accompanied by his wife, then drove to East Greenwich around 3 p.m. to make a security check and start the furnace at Chronomatics, a family-owned metallurgics business where he was employed. He carried a licensed .380 pistol, as was his habit when delivering precious metals or performing checks at the business. After driving his wife back to their house, defendant left to photograph the sunset while drinking three beers. Around 6 o'clock in the evening defendant proceeded to Pete's Pizza, where he consumed a sandwich and another beer. After watching television for a while, defendant sat down with Chatelle, who ordered beers for both of them. The men, strangers before their chance meeting, struck up a conversation that continued for several hours, and they also engaged in repeated arm wrestling until the owner of Pete's halted this activity and refused to serve them more beer. The pair eventually left together between 9 and 9:30 that night, continued their conversation in defendant's truck in the parking lot while drinking beer that defendant provided, then drove to Chatelle's house, after first making a

stop at Chatelle's brother's house. Chatelle's house was described by both men as cold, dark, and extremely untidy. The men drank more beer, which defendant fetched from his truck, and after Chatelle had checked his answering machine, he invited defendant to see the upstairs of the house.

From this point, Chatelle's account of that evening's events diverged from that of defendant. According to defendant, Chatelle showed him his seventeen-year-old ex-girlfriend's brightly-lit room with a waterbed on which were dozens of stuffed animals. The defendant testified that he began to feel uncomfortable about Chatelle, declined to see his bedroom, and decided to leave the house after first using the bathroom. He further recounted that while relieving himself, Chatelle looked "directly into [defendant's] groin area" while flushing the toilet, and then patted defendant's buttocks. The next memory defendant recalled was of lying in Chatelle's kitchen, lifting himself on his elbow, and hearing Chatelle claim to have been shot. After applying pressure to Chatelle's wound with his palm, defendant, while searching for some material to fashion a tourniquet, told Chatelle to call 9-1-1 and press down on the wound. After returning to Chatelle, defendant overheard him report the shooting on the phone. The defendant left after Chatelle told him that he had called his brother who was on his way to "blow [defendant's expletive] head off." Back on the road, defendant overheard reports on his scanner that police were at his home, so he decided to drive to his parents' house instead. On his way there, he emptied his gun of all bullets and threw them into the woods. Upon arrival at his parents' house, defendant was arrested.

In his different account of the later events of the evening, Chatelle testified that he showed the stuffed animal collection to defendant because he was proud of his skill in winning them from a crane machine. Both men returned to the kitchen where they continued to converse and drink beer. After calling his cat inside, Chatelle suddenly noticed that defendant "had a gun on the table." Chatelle testified that defendant handed the gun to him, encouraged him to "check it out," then returned it to his pocket, after which Chatelle asked defendant for a ride back to Pete's Pizza parlor. Chatelle testified that defendant refused this request, while pointing his gun at Chatelle's foot. Chatelle jumped up, his hands in front of his groin area, and in that instant, "the gun discharged." Chatelle described how defendant stood in a "total séance type of daze" and then told Chatelle "to call somebody." Chatelle testified that he was bleeding profusely and denied that defendant made any attempt to render first aid before leaving the premises. After Chatelle called his brother and 9-1-1, his brother arrived and tried to stem the bleeding. Rescue personnel eventually airlifted Chatelle to a hospital where he underwent surgery for a severe injury to his right thigh.

The defendant was initially charged with one count of assault with intent to murder, in violation of G.L.1956 § 11-5-1, and one count of assault with a dangerous weapon, in violation of § 11-5-2. At some point during the jury trial that began on April 15, 1997, the first count of assault with intent to murder was dismissed upon motion by the state, pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. After the state had rested its case, defendant moved for a judgment of acquittal that was denied by the trial justice. The defendant was found guilty of the remaining charge. The defendant's motion for a new trial was denied, and on September 11, 1997, defendant was sentenced to fifteen years, with four to serve, eleven suspended, and eleven years probation after his release. In addition, defendant was ordered to have no contact with Chatelle and to undergo alcohol counseling. He was permitted to remain free on bail, pending this appeal. Additional facts

will be discussed as required in the legal analysis of the issues raised.

## Defendant's Motion for Acquittal

The defendant's first claim of error was that the trial justice erred in denying his motion for judgment of acquittal on the charge of assault with a dangerous weapon upon Chatelle. In so doing, defendant pointed to the uncontradicted testimony of the treating physician, Dr. Christopher Morin (Dr. Morin), who testified that it was impossible that the bullet in Chatelle's leg had been fired in the manner Chatelle described. Pursuant to Rule 29(a) of the Superior Court Rules of Criminal Procedure,

> "[t]he court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, information, or complaint after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."

■ We have consistently held that "[i]n considering a motion for judgment of acquittal, a trial justice must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, in fact giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt." *State v. King*, 693 A.2d 658, 663 (R.I.1997) (quoting *State v. Snow*, 670 A.2d 239, 243 (R.I.1996)). "If the totality of the evidence so viewed and the inferences so drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt, the motion for judgment of acquittal must be denied." *Id.* "This Court reviews the denial of a motion for judgment of acquittal by the same standard as that applied by the trial justice, namely, by viewing the evidence in the light most favorable to the state, without weighing the evidence or assessing the witnesses' credibility." *State v. Jackson*, 752 A.2d 5, 8 (R.I.2000) (citing *Snow*, 670 A.2d at 243).

■ The trial justice in the present case, applying the correct standard under Rule 29(a), considered defendant's argument regarding Dr. Morin's testimony, which she characterized as "compelling," but she denied the motion in light of other evidence that inculpated defendant, namely Chatelle's testimony that defendant had shot him. This Court has held that a victim's testimony alone is sufficient to sustain a conviction, and we have affirmed a trial justice's determination that a jury could find a defendant guilty solely on the basis of such evidence. *State v. Andrades*, 725 A.2d 262, 263 (R.I.1999) (per curiam). Given the amount of inculpatory evidence presented here by the state and given the inferences that could be drawn therefrom, we conclude that a reasonable juror would have been justified in finding defendant guilty beyond a reasonable doubt. Therefore, we affirm the trial justice's denial of defendant's motion for judgment of acquittal.

## Motion for a New Trial

In the alternative, defendant asserted that the denial of his motion for a new trial was error, based on Chatelle's out-of-court statements in which he admitted hitting defendant before the shooting. The defendant also offered expert testimony by Brown University neurologist Thomas Morgan, M.D. (Dr. Morgan), who hypothesized that defendant had suffered from partial amnesia caused by a recent blow to the head, a circumstance that was corroborated by another physician, who treated defendant for a broken nose two days after the shooting.

■ We have repeatedly held that in deciding a motion for a new trial, the trial justice must determine "whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt." *State v. Scurry*, 636 A.2d 719, 725 (R.I.1994). In making this decision, "the trial justice acts as a thirteenth juror and exercises independent judgment on the

credibility of witnesses and on the weight of the evidence." *State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994). Provided that the trial justice has "articulated an adequate rationale for denying a motion," *State v. Bleau,* 668 A.2d 642, 646 (R.I. 1995), a trial justice's ruling on a new trial motion is entitled to great weight. *State v. Dame,* 560 A.2d 330, 332 (R.I.1989). Nevertheless, we shall overturn a ruling on a motion for a new trial, if the justice overlooked or misconceived material evidence or was otherwise clearly wrong. *Scurry,* 636 A.2d at 725.

 On appeal, defendant contended that there was uncontradicted testimony by Dr. Morgan that defendant had suffered "a classic concussion with a post-traumatic amnesia caused by * * * a blow across the face causing an accelerated type of injury to his brain," thereby explaining defendant's selective memory of the events on February 5, 1995. Doctor Morgan based his diagnosis, among other things, on the audio tape and transcript of the statement given by defendant to police following the shooting, on an x-ray report of defendant's skull and face, on photographs of defendant, and on an office report by the physician who diagnosed defendant's broken nose. This Court has stated, however, that even uncontradicted testimony may be rejected by the trier of fact. *Hughes v. Saco Casting Co.,* 443 A.2d 1264, 1266 (R.I.1982). We have held, for example, that "[p]ositive, uncontradicted evidence * * * may be rejected if it contains inherent improbabilities or contradictions that alone or in connection with other circumstances tend to contradict it. Such testimony may also be disregarded on credibility grounds as long as the fact finder clearly but briefly states the reasons for rejecting the witness's testimony." *Id.* In her decision denying defendant's motion for a new trial, the trial justice did not address Dr. Morgan's testimony, but did refer repeatedly to defendant's inability to remember: "[I]t seems incomprehensible that a person of Mr. Rieger's facul-

ties would forget shooting a person." She also pointed out that defendant remembered his activities and interactions with Chatelle in great detail, but that "[t]he only absent portion of the evening is the very moment of the shooting." Doctor Morgan's diagnosis of post traumatic amnesia was supported by some physical evidence. Shortly after his arrest, a police officer observed that defendant had a "scrape on his forehead" and was bleeding from his nose. On February 7, 1995, defendant's physician rendered a diagnosis that defendant had suffered a broken nose and a four-inch linear abrasion from his right forehead across the bridge of his nose and into his left cheek. This evidence was consistent with Dr. Morgan's diagnosis that defendant suffered a concussion from an injury to the head.

 Although here the trial justice failed to articulate a rationale for rejecting Dr. Morgan's testimony, in light of the undisputed evidence inculpating defendant, we are of the opinion that the trial justice could properly find that the testimony, although uncontroverted, was inherently improbable. Although there was no dispute that defendant was injured near the time of the shooting, neither the source nor the effect of the injury could be determined definitively, and at first, defendant himself stated that he sustained the injury during his arrest. It would be mere speculation to determine defendant's state of mind during the period he no longer could remember. More important, any such evidence clearly was insufficient to advance a theory of self-defense. In this jurisdiction, "[i]t is well settled law that individuals believing that they are in imminent peril of bodily harm can use such nondeadly force as is reasonably necessary in the circumstances to protect themselves." *State v. Martinez,* 652 A.2d 958, 961 (R.I.1995); *State v. Fetzik,* 577 A.2d 990, 994 (R.I. 1990); *State v. Quarles,* 504 A.2d 473, 475 (R.I.1986); *State v. Tribble,* 428 A.2d 1079, 1082 (R.I.1981). As we have explained in *State v. Guillemet,* 430 A.2d 1066, 1068

(R.I.1981), although a person may defend himself or herself without the necessity of waiting for the first blow, the individual may use only such force as is reasonably necessary to protect himself or herself. Furthermore, in the case of deadly force, "individuals [who are] attacked must attempt to retreat if they are consciously aware of an open, safe and available avenue of escape." *Martinez*, 652 A.2d at 961.

In the instant case, defendant reported that he spent considerable time in Chatelle's company without ever feeling threatened. He was at all times free to leave the house and, in fact, he left briefly to return with more beer. Even defendant's description of the incident in Chatelle's bathroom did not include any anticipation of "imminent danger of bodily harm." We have held repeatedly that " 'once the defendant introduces some evidence of self-defense, the burden of persuasion is on the prosecution to negate that defense beyond a reasonable doubt.' " *State v. Pule*, 453 A.2d 1095, 1098–99 (R.I. 1982); *see also State v. Caron*, 423 A.2d 823, 827 (R.I.1980). Nothing in defendant's testimony provided evidence necessary to support a theory of self-defense, nor was the boasting by Chatelle that he had "whacked [defendant] out with a wooden something" during a fight sufficient to shift the burden of persuasion to the state.

### Testimony on Defendant's Truthfulness

In his appeal, defendant argued that testimony by several police officers concerning defendant's truthfulness should not have been admitted, and he urged this Court to "relax its strict object-or-waive rule." It is a well-established rule of law that "[t]he determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury." *State v. Haslam*, 663 A.2d 902, 905 (R.I.1995); *see also State v. James*, 557 A.2d 471, 473 (R.I.1989). Moreover, we have held in *Haslam*, that "a witness is not permitted to offer an opinion concerning the truthful-

ness of the testimony of another witness," and that "when a witness does not literally state an opinion concerning the credibility of another witness but his or her testimony would have the same 'substantive import,' such testimony is inadmissible." *Haslam*, 663 A.2d at 905.

In the present case, three police officers offered testimony about defendant's credibility after defendant had first elicited such opinion. The record reveals the following interchange during defense counsel's cross-examination of Detective Thomas Beaulieu, who questioned defendant on the night of the shooting:

"Q: During the course of your questioning of Mr. Rieger, would it be fair to say that from beginning to end, he insisted that he didn't remember what happened with the shooting?

"A: Yes.

"Q: Do you have any reason to believe he wasn't being sincere with you?

"[Counsel for the State]: Objection.

"The Court: Are you sure you want to object to that?

"[Counsel for the State]: I'd be happy to let him answer.

"The Witness: Could you repeat the question?

"The Court: Go ahead, Mr. Craven.

"Q: Do you have any reason to believe that he wasn't telling you the truth?

"A: Other than a gut feeling, no. I don't believe he was being honest with me about shooting Mr. Chatelle."

In the following redirect examination, the state took the opportunity to ask the witness about his opinion of defendant's truthfulness. On this single occasion defendant did raise a general objection that was overruled by the court. Prior testimony by two other investigating police officers concerning the same issue met no objections by defendant, nor was there objection when the state made reference to their testimony in closing ar-

gument. We have repeatedly explained that "[a]ccording to our well-settled 'raise or waive' rule, issues that present themselves at trial and that are not preserved by a specific objection at trial, 'sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal.'" *State v. Anderson*, 752 A.2d 946, 948 (R.I.2000) (quoting *State v. Morris*, 744 A.2d 850, 858–59 (R.I.2000)). "Consequently, allegations of error committed at trial are considered waived if they were not effectively raised at trial, despite their articulation at the appellate level." *Anderson*, 752 A.2d at 948 (quoting *Morris*, 744 A.2d at 858–59).

■ The record here reveals that defense counsel failed to object to any testimony by police officers about defendant's truthfulness, except in one instance. The objection was a general one, however, and therefore we conclude that the issue of opinion testimony on defendant's honesty was not properly preserved for our review. Although we have recognized an exception to the raise-or-waive rule if "basic constitutional rights are concerned," *State v. Mastracchio*, 672 A.2d 438, 446 (R.I.1996), "the error asserted must go beyond the level of harmless error, the record must be 'sufficient to permit a determination of the issue,' and counsel's failure to raise the issue must be premised upon 'a novel rule of law that counsel could not reasonably have known during the trial.'" *State v. Donato*, 592 A.2d 140, 142 (R.I.1991). We are persuaded here that the requirements for an exception have not been met and that the rule on credibility of witnesses was sufficiently established to be known to defense counsel at trial.

### Testimony by the State Medical Examiner

■ In reviewing a trial justice's decision on the admissibility of expert testimony, this Court will not reverse the decision unless the trial justice abused his or her discretion. *State v. Morales*, 621 A.2d 1247, 1249 (R.I.1993) (citing *Gaglione v. Cardi*, 120 R.I. 534, 538, 388 A.2d 361, 363 (1978)). "The degree of conclusiveness which characterizes the testimony of a witness, properly qualified to give his [or her] opinion as an expert, goes only to the weight and not the admissibility of the evidence." *State v. Vargus*, 118 R.I. 113, 127, 373 A.2d 150, 157 (1977). We have therefore held that "the jury is always free to accept, to reject, or to accord any amount of weight it chooses to the expert's testimony." *Id.* In the present trial, defendant sought to limit the testimony of Elizabeth Laposata, M.D., Chief Medical Examiner for the State of Rhode Island (Dr. Laposata), in respect to the deformed bullet that remained in Chatelle's leg, arguing that Dr. Laposata's expertise was in pathology, not ballistics. Previously, two other expert witnesses had testified that the bullet could not have been deformed by striking Chatelle's femur without shattering the bone, a conclusion that supported defendant's theory that Chatelle was holding an object at the time of the shooting. In contrast, after reviewing medical reports, photographs of the wounds, x-rays of the injury and the bullet, the ballistics report, and the report by defendant's expert witness, Dr. Laposata testified that it was not uncommon for a bullet to hit bone and ricochet without damaging it and that without looking at the bone, it would be impossible to determine conclusively how the bullet had become deformed. The admission of expert testimony is governed by Rule 702 of the Rhode Island Rules of Evidence, which states:

> "**Testimony by experts.**—If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

■ In respect to her qualification, Dr. Laposata testified that she was trained in

forensic pathology and, in her capacity as medical examiner, had determined the cause of death and injury of hundreds of persons killed by firearms. To that end, she would examine the body, remove the bullet, examine it, and establish the trajectory. In *Morales,* 621 A.2d at 1249, we held that a forensic pathologist was qualified to render an opinion on the distance from which the defendant fired a gun, given that the witness had attended firearms seminars on the subject and had on prior occasions examined gunshot wounds. Therefore, we conclude here that the trial justice correctly found that Dr. Laposata's experience with bullet wounds qualified her to render an opinion to the jury on how the bullet became deformed. Defense counsel was afforded an opportunity to cross-examine the witness, and the jury could properly determine the weight to be accorded this evidence.

### Conclusion

For the foregoing reasons, we deny and dismiss the defendant's appeal, and we affirm the judgment of the Superior Court, to which the papers in the case may be returned.