STATE

v.

Thomas H. AUSTIN.

No. 95–494–C.A.

Supreme Court of Rhode Island.

May 6, 1999.

Annie Goldberg, Aaron L. Weisman, Providence, for Plaintiff.

Manuel A. Suarez, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, and FLANDERS, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on the appeal of the defendant, Thomas H. Austin (defendant), from a judgment of conviction entered in the Superior Court for assault with intent to rob while armed and assault with a dangerous weapon. For the reasons that follow, we affirm the judgment of the Superior Court. The travel and facts of this case insofar as pertinent to this appeal are as follows.

The defendant was convicted at separate trials during the year 1991 for charges arising out of the robbery and attempted robbery of three banks in Providence, North Providence, and East Providence in January and February of 1990. *See State v. Austin* 643 A.2d 798 (R.I.1994) (*Austin III* ) (East Providence bank robbery); *State v. Austin* 642 A.2d 673 (R.I.1994), (*Austin II* ) (North Providence bank robbery); *State v. Austin,* 641 A.2d 56 (R.I. 1994) (*Austin I* ) (first appeal from conviction in the case at bar). This appeal concludes the *Austin* trilogy.

At approximately 10 a.m. on January 5, 1990, a man approached Jacqueline Donnelly's (Donnelly) teller window at a Hospital Trust Bank branch on Charles Street in Providence, brandishing a gun and demanding money. Donnelly, frozen with fear, was unable to comply with the gunman's demands. Walter Michalczyk (Michalczyk), the branch manager, had seen the bandit before. In late December of 1989, Michalczyk had approached this man in the bank, but the man just "mutter[ed] to himself" before leaving the bank. The day before the robbery, the man re-emerged at the bank, only to leave when he saw Michalczyk watching him. Thus, when the man entered the bank on the morning of January 5, Michalczyk kept a watchful eye on him. Upon discovering Michalczyk observing him, the gunman left empty-handed.

Seven weeks later, the Savings and Trust Bank in East Providence was robbed at gun point. This time, the robbery was recorded by the banks surveillance camera. Two East Providence police investigators reviewed the tape and recognized the robber as the defendant whom they had known from their service as prison guards at the Adult Correctional Institutions. Consequently, a warrant was issued for defendant's arrest.

On February 27, 1990, acting on information concerning his whereabouts, East Providence detectives, with the assistance of Providence detective William McGurn (McGurn), apprehended defendant in a storage room at Fiore's gas station on Atlantic Avenue in Providence. The defendant was then transported to Providence Police Headquarters. Believing that defendant matched the description of the still at-large gunman from the attempted holdup at the Providence bank, McGurn called Donnelly and Michalczyk to view the line-up. Both identified defendant as the perpetrator of the attempted robbery at their bank. The defendant was then charged with offenses arising out of this attempted robbery.[1]

---

1. The defendant was charged with carrying a firearm after a previous conviction of a crime of violence, assault with intent to rob while armed, assault, possession of a stolen vehicle, and assault with a dangerous weapon. The charge of carrying a firearm after a previous

The defendant was eventually brought to trial on September 9, 1991 for assault with intent to rob while armed and assault with a dangerous weapon. The trial justice denied defendant's motion to suppress the line-up identifications and motion to dismiss for want of a speedy trial. The prosecution called, among other witnesses, Donnelly and Michalczyk, both of whom re-identified defendant as the gunman. The defendant called Frank Altomari, Robert Hart, and William Kennedy, three of the four police officers who posed in the line-up with defendant, in an attempt to illustrate the suggestiveness of the identification procedure. At the conclusion of the trial, the jury found defendant guilty of both counts. The trial justice then sentenced defendant to twenty years for assault with intent to rob and ten years for assault with a dangerous weapon, both sentences to be served concurrent with each other but consecutive to sentences that defendant was already serving for his other bank robberies.

The defendant appealed his convictions, "contend[ing] that the trial justice erred by (1) denying his motion to suppress a line-up identification as the fruit of an unlawful arrest and (2) denying his motion to dismiss for lack of a speedy trial." *Austin I,* 641 A.2d at 56. In his first appeal arising out of this incident, our decision in *Austin I,* remanded this case to the Superior Court to determine whether defendant's arrest was executed pursuant to a valid warrant. "[P]ending the disposition of the warrant issue, we did not reach the remainder of [defendants] arguments." *Id.* at 58. On remand, the trial justice determined that defendant's arrest was founded on a validly issued warrant, and this finding is not challenged on appeal. Consequently, the case now returns to us for consideration of defendant's remaining claims of error.

conviction of a crime of violence was severed before trial and the assault and possession of a stolen vehicle charges were dropped by the

*Line-up Procedures*

First, defendant contends that he was denied his right to counsel at the pre-arraignment line-up performed by the Providence police, and that this denial requires the suppression of identifications gained through this impermissible identification procedure. However, this issue was not raised as a basis for an objection at trial, and therefore is waived on appeal. *See State v. Pineda,* 712 A.2d 858, 861 (R.I.1998). Moreover, even if preserved for appeal, defendant's argument on this point is without merit, since no right to counsel exists at pre-arraignment line-ups. *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *State v. Holland,* 430 A.2d 1263, 1272 (R.I.1981); *State v. Delahunt,* 121 R.I. 565, 571–72, 401 A.2d 1261, 1265 (1979).

Second, defendant asserts that the line-up procedures used by the Providence police were so suggestive that the procedures produced a substantial likelihood of misidentification. Specifically, defendant maintains that his prominent nose made him "stick out" from the other members of the line-up who had less distinguished nasal features. Therefore, defendant concludes, the trial justice erred when he denied defendant's motion to suppress the line-up identifications.

In reviewing a claim of suggestive identification, we must consider each case on its facts to determine whether the identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite,* 432 U.S. 98, 105 n. 8, 97 S.Ct. 2243, 2248 n. 8, 53 L.Ed.2d 140, 148 n. 8 (1977) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968)); *see also State v. Andrade,* 657 A.2d 538, 541 (R.I.1995) (applying *Manson*). However, even if the identifi-

prosecution pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

cation is the product of suggestive procedures, the admission of testimony concerning a suggestive identification "does not violate due process so long as the identification possesses sufficient aspects of reliability." *Manson*, 432 U.S. at 106, 97 S.Ct. at 2249, 53 L.Ed.2d at 149. The " 'central question' is 'whether under "the totality of circumstances" the identification was reliable even though the confrontation procedure [may have been] suggestive.' " *Id.*

"The factors to be considered * * * include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his [or her] prior description of the criminal, the level of certainty demonstrated at the confrontation [identification procedure], and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id.* at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154.

In this case, the Providence police used neutral, non-suggestive procedures. The members of the line-up were sufficiently similar in appearance, despite defendant's claim to the contrary, that the line-up did not impermissibly suggest the identity of the suspect. *See State v. Pailon,* 590 A.2d 858, 862 (R.I.1991) (citing *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969)). All line-up members were white males of approximately the same age, build, height while seated, and complexion. In fact, defendant called three of the four officers as witnesses in the hope of convincing the jury that Donnelly and Michalczyk's identifications were the product of suggestion. This tactic proved unsuccessful, however, as the jury took only twenty minutes to find defendant guilty on both counts.

Nor were the Providence police under an obligation to produce a line-up of persons with similar noses, as defendant urged at trial. We have never required that line-ups be composed of near identical people, but only that line-up members be "reasonably similar." *State v. Cline,* 122 R.I. 297, 327, 405 A.2d 1192, 1208 (1979); *see also State v. Walker,* 667 A.2d 1242, 1248–49 (R.I.1995) (suspect only line-up member with white pants; not suggestive); *State v. Camirand,* 572 A.2d 290, 293–94 (R.I.1990) (suspect only line-up member with beard; not suggestive); *State v. Robichaud,* 118 R.I. 684, 688, 376 A.2d 1053, 1056 (1977) (rejecting argument that defendant "was the only 'pretty' woman" in the line-up). Requiring that line-up participants be near mirror images would set an impossible standard and embroil the courts in determining the significance of subtle physical differences.

Additionally, Officer McGurn's unrebutted testimony was that he had the witnesses view the line-up separately, so neither identification could influence the other, and that he made no indication of which line-up member was the suspect. Donnelly corroborated McGurn's testimony, asserting that she was separated from Michalczyk, only told "not to be afraid," and only asked "if I could identify one of them" in the line-up. The defendant made no inquiry into the circumstances surrounding Michalczyk's identification. Therefore, nothing in the police procedures suggested which member of the line-up was the suspect. Consequently, the fact that defendant has a large nose is insufficient in this case to render the line-up unduly suggestive.

■ Moreover, even if the identification procedures were suggestive, under the totality of circumstances, we find that "a very substantial likelihood of irreparable misidentification" does not exist. *Manson,* 432 U.S. at 105 n. 8, 97 S.Ct. at 2248 n. 8, 53 L.Ed.2d at 148 n. 8. Both Donnelly and Michalczyk, while agreeing that defendant's nose was large, denied under vigorous cross-examination that this feature alone led to their identification of defendant. Donnelly stated that "I picked him out as the man I saw, not just because of his nose, that is what I remember." Mi-

chalczyk testified to a number of characteristics other than defendant's nose, from height to taut skin, that led him to identify defendant. Each had a clear opportunity to observe the gunman during the attempted robbery, and the gunman undoubtedly demanded their undivided attention. Moreover, Michalczyk observed the same man twice in the preceding two weeks and correctly described defendant's facial characteristics and approximate age when questioned by the police just after the crime. Additionally, he was able to identify defendant after viewing the lineup for only ten to fifteen seconds. Even though Donnelly told police that she never looked at the bandit's face, seeing defendant at the line-up "sparked a memory" and she was able to identify him "right away." While approximately eight weeks had passed between the crime and the line-up, in view of the other indicia of reliability, this lapse does not alter our view that the line-up did not create "a very substantial likelihood of irreparable misidentification." *Id.* Consequently, we conclude that the trial court was correct to deny defendant's motion to suppress these identifications.

### Speedy Trial

 Lastly, defendant argues that his right to a speedy trial has been violated, and therefore, the trial justice erred when he denied defendant's motion for a new trial on these grounds. A defendant's right to a speedy trial is guaranteed by article 1, section 10, of the Rhode Island Constitution and the Sixth Amendment to the United States Constitution. *Austin III,* 643 A.2d at 800; *see also State v. Fortier,* 427 A.2d 1317, 1321 (R.I.1981) (the Fourteenth Amendment incorporates the Sixth Amendment right to speedy trial). *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), enunciates a four factor test to determine whether a

defendant has been denied the right to a speedy trial. *See Tate v. Howard,* 110 R.I. 641, 647–48, 296 A.2d 19, 23–24 (1972) (adopting *Barker* ). The court must consider "(1) the length of the delay, (2) the reason for delay, (3) the defendant's assertion of his [or her] rights, and (4) the prejudice to the accused." *State v. Allan,* 433 A.2d 222, 224 (R.I.1981); *see Barker,* 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. "The determination of whether the right to a speedy trial has been violated requires the weighing of each factor, with no single one being wholly dispositive." *State v. DeAngelis,* 658 A.2d 7, 11 (R.I.1995).

 The first factor, the length of delay, triggers review of the remaining factors if the delay is long enough to be presumptively prejudicial. *State v. Bleau,* 668 A.2d 642, 645 (R.I.1995). In this case, over a year and a half[2] elapsed between the time of defendant's arrest and the start of his trial for the charges stemming from his arrest. The state concedes that this delay is presumptively prejudicial and we accept this concession. *See also State v. Tarvis,* 465 A.2d 164, 175 (R.I.1983) (twelve-month delay "presumptively prejudicial"). Consequently, we turn to the other *Barker* factors.

 The second *Barker* factor is the reason for delay. Different reasons for delay are assigned different weights.

"A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate

---

2. The delay ran from the date of arrest, February 27, 1990, until the start of trial, September 19, 1991, a total of 568 days.

delay." *State v. Powers,* 643 A.2d 827, 831 (R.I.1994) (quoting *Barker,* 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117).

"Generally, each party is likely to bear at least some responsibility in contributing to [a year and a half] delay, and this case is no exception. *Barker* requires us to evaluate the reasons for the delay and to balance the culpability of the parties in causing the delay." *Powers,* 643 A.2d at 831. The primary reason for this case's delay was court congestion. From October 24, 1990, when the case was passed for trial, until September 19, 1991, when finally reached for trial, the case was either not reached for trial or postponed by court request twenty-four times. Some of this delay is attributable to the fact that defendant was tried during 1991 for two other cases involving bank robberies that occurred within the same time-frame. As we counseled in *Austin III,* 643 A.2d at 801, "[t]he right to a speedy trial does not require the state to try a single defendant simultaneously for several unrelated offenses." However, these trials only accounted for a portion of the delay.[3]

The defendant also bears some of the responsibility for the delay. On October 3, 1990, defendant requested and was granted a cancellation of a pre-trial conference in order to consider a disposition offered by the prosecution. This action postponed the case two weeks. Later, the case was postponed twice for a total of twenty-five days so that defendant could find new counsel after his previous attorney had withdrawn from the case. *See State v. Johnson,* 688 A.2d 285, 288 (R.I.1997) ("difficulty in finding satisfactory appointed counsel" weighs against defendant).

However, defendant's three delays equaling approximately thirty-nine days are not of major significance when viewed in the context of a year and a half overall delay. In sum, the state bears the responsibility for the great bulk of the delay, but this fault is weighted less heavily because the delay was the product of crowded calendars and not deliberate conduct.

■ The third *Barker* factor is defendant's assertion of his right to a speedy trial. The defendant filed motions to dismiss for want of speedy trial on January 2, 1991 and June 26, 1991. "[W]hen assessing a defendant's assertion of his right to a speedy trial, this Court looks for actions sufficiently aggressive to constitute the equivalent of a 'banging on the courthouse doors.'" *Bleau,* 668 A.2d at 645 (quoting *Powers,* 643 A.2d at 833, in turn quoting *Tate,* 110 R.I. at 656, 296 A.2d at 27). In the instant case, over the course of a year and a half, defendant never requested a speedy trial. Instead, he waited until ten months after his arrest, then moved to dismiss the charges. He renewed this motion five months later. Rather than demanding entry into the courtroom, defendant sat on his rights then asserted them as a means to avoid a trial. Therefore, we feel that defendant's efforts fall short of evidencing a real desire to invoke his constitutional rights and proceed to trial. *See State v. Macaskill,* 523 A.2d 883, 885 (R.I. 1987).

■ The last *Barker* factor is the prejudice occasioned to the accused by the trial delay. Although conceding on appeal that "[t]here was no specific showing in this case of demonstrable specific prejudice,"[4] defendant points to the three types of

---

**3.** *State v. Austin,* 642 A.2d 673 (R.I.1994), (*Austin II*) was originally brought to trial on March 11, 1991, but ended almost immediately in a mistrial when the pool of prospective jurors heard prejudicial remarks about the defendant unrelated to this case. *Id.* at 675. The case was eventually tried April 9–11, 1991. *State v. Austin,* 643 A.2d 798, 801 (R.I.1994) (*Austin III*) (discussing *Austin II*). *Austin III* was tried August 26–29, 1991. The

trial in this case commenced September 19, 1991.

**4.** This concession was made in defendant's brief for his original appeal of this conviction, and was implicitly adopted by his after-remand brief, which asked that this issue now be decided without providing further legal argument.

prejudice catalogued by *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118 —pretrial incarceration, anxiety and disruption of the defendant's life, and impairment of the ability to present a defense—which he has allegedly suffered. However, defendant suffered no prejudice resulting from pre-trial incarceration or disruption of his life, as he was already being held for other crimes committed during his robbery spree. *See Walker*, 667 A.2d at 1246 (no prejudice when defendant being held in New York on unrelated charges); *see generally State v. Austin*, 643 A.2d 798 (R.I.1994) (*Austin III*); *State v. Austin*, 642 A.2d 673 (R.I.1994), (*Austin II*). Likewise, he presented no evidence in support of his contention that he has suffered extraordinary anxiety. Mere allegations of mental trauma without more are insufficient to prove prejudice. *State v. Hernandez*, 641 A.2d 62, 68 (R.I. 1994); *Macaskill*, 523 A.2d at 886. Additionally, defendant has made no showing of how the delay affected his ability to mount a defense. At trial, defendant argued that the delay prevented him from presenting an alibi witness, yet never supplied the prosecution with the properly requested alibi defense notice, *see* Super. R.Crim. P. 16(c), or argued how the delay prevented him from presenting this witness. *See Hernandez*, 641 A.2d at 68 (failure to link inability to produce potential witness with trial delay warrants finding of no prejudice). Therefore, we hold that defendant suffered no actual prejudice from the delay.

When the *Barker* factors are placed on the scale, defendant's halting assertion of his speedy trial right and lack of prejudice outweigh the state's slight fault for negligently delaying the trial. Accordingly, we conclude that the trial justice correctly denied defendant's motion to dismiss for want of a speedy trial.

For the foregoing reasons, the defendant's appeal is denied and dismissed. The judgment of conviction is affirmed and the papers in this case are remanded to the Superior Court.

Justices BOURCIER and GOLDBERG did not participate.