**Supreme Court**

No. 2011-77-Appeal.
(PM 09-4622)

Nelson Bido            :

v.            :

State of Rhode Island.            :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Nelson Bido                    :

v.                             :

State of Rhode Island.         :


Present:  Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.


**O P I N I O N**

**Justice Goldberg, for the Court.**  The applicant, Nelson Bido (Bido or applicant), is before the Supreme Court on appeal from a Superior Court judgment that denied his application for postconviction relief.  He argues that the trial justice erred in dismissing his application that alleged, principally, the ineffective assistance of his trial counsel based on counsel's failure to move for dismissal of the indictment on speedy-trial grounds.  After a careful review of the record, we affirm the judgment of the Superior Court.

**Facts and Travel**

In May 2006, Bido was convicted of aiding and abetting murder and conspiracy to commit robbery.  The underlying facts are set forth in detail in our opinion affirming that conviction.  State v. Bido, 941 A.2d 822, 825-27 (R.I. 2008).  We therefore recount only those facts pertinent to the primary issue raised in Bido's application.

On April 15, 1991, Jorge Confessor (Confessor) was shot in the back and robbed of a brown paper bag containing approximately $29,000 in cash and check deposits in a Citizens Bank parking lot in Providence.  Confessor was pronounced dead at the scene.  An eyewitness to

the crime memorized the license plate number of the getaway vehicle; Providence police traced the license plate to Bido.

Shortly after the shooting, Bido returned to his apartment, and his then-girlfriend, Rosalinda Colon (Colon), hastily helped him pack up his belongings and leave. Bido disclosed to Colon that he was "in trouble" because he "did something wrong." Bido told her that he was "going to New York," and, within five minutes, Bido fled to New York City. Before doing so, however, he asked Colon to dispose of a bag, together with its contents, that he had left in the apartment. When she looked inside the bag, Colon discovered a firearm; this weapon later was determined to be the weapon used to murder Confessor. When the police arrived at Bido's home, Colon informed them that Bido had fled, and she directed them to the basement, where they seized the gun.

Providence police contacted New York City authorities, and, on July 2, 1991, two New York City police detectives arrested Bido after he entered a vehicle bearing the same license plate as the car used in Confessor's murder. Bido volunteered to the detectives that he knew that his arrest was "about Rhode Island." At the police station, Bido agreed to speak with police, and he gave a statement explaining that he had let an acquaintance borrow his vehicle knowing that it would be used in a robbery. The New York City detectives relayed this information to the Providence police.

Bido remained in a New York jail for several months, awaiting a governor's warrant for extradition to Rhode Island. During this time, Bido married Colon, "apparently so that [Colon] could not be used as a witness against him." Bido, 941 A.2d at 827. Meanwhile, Providence police traveled to New York along with attorney David Morowitz (Morowitz), the prosecutor who was assigned to the case in its early stages; however, the grand jury proceedings were not

- 2 -

completed within the statutory period, and Bido was released from police custody sometime in October 1991. On July 2, 1992, an indictment was returned by the grand jury.

It was not until 2005 that Bido was arrested and brought to Rhode Island. His trial, which commenced in May 2006, culminated in guilty verdicts for the crimes of conspiracy to commit robbery and aiding and abetting murder. In his direct appeal, Bido contended, inter alia, that an ambiguous statement he made to the trial justice, in the context of a request for new counsel immediately before the start of trial,[1] should have been understood to be a motion to dismiss for lack of a speedy trial. Bido, 941 A.2d at 827-29. We declined to consider this speedy-trial contention, concluding that, because Bido "did not put forth his argument in a rational and recognizable posture to the trial justice[,]" it had not properly been preserved. Id. at 829. This Court affirmed Bido's conviction in all respects. Id. at 837.

On August 12, 2009, Bido filed a pro se application for postconviction relief, setting forth five allegations of error.[2] After counsel was appointed to represent him, an amended application

---

[1] Bido relied on the following statement he made to the trial justice:

"I don't feel really comfortable with [defense counsel] representing me. I [sic] been in prison three times for the same case already. I've never rejected coming here at any point. I don't know why they release [sic] me. I lived 15 years in the same street, the same house with the same lady; filing security tax, the same name. Why didn't they arrest me before I went to renew my green card at immigration before? And right there they arrested me and told me that the case was still open. And then they arrested me and then they released me back there. And then I kept coming back to court during those three months, and three months later they came back and arrested me again. And I [sic] been here for eight and a half months or so. The first time, I was five and a half months there waiting for them to come. And the second time they arrested me, I was there in prison for four days. So, I don't know what is happening right now. I have never been that type of person that they accuse me of." State v. Bido, 941 A.2d 822, 828 (R.I. 2008).

[2] Specifically, Bido alleged: (1) that the extradition process used by Rhode Island authorities to obtain custody over him from New York authorities was faulty; (2) that the fourteen-year delay

- 3 -

and accompanying memorandum of law were filed that exclusively focused on the allegation that counsel's failure to seek dismissal of the indictment on speedy trial grounds amounted to ineffective assistance of counsel.

An evidentiary hearing was held on April 16 and 19, 2010. Three witnesses testified: Bido, his defense counsel, and Morowitz. Bido sought to explain that, for much of the fourteen-year delay between his July 2, 1991 arrest in New York City and his 2005 arrest and extradition to Rhode Island, it was his belief that the case against him in Rhode Island had been closed. He also raised an alibi, declaring that he was in New York, and not Rhode Island, at the time of Confessor's murder and that when he was released in July 1991, he was told that Rhode Island had insufficient evidence to proceed against him. He testified that he took this to mean that the case was closed. Bido stated that he did not receive notice of the indictment and that, if he had been made aware of the charges, he would have returned to Rhode Island "right away." Bido testified that it was only in 2005, when he went to the Department of Homeland Security on an unrelated matter, that he learned—to his surprise—that the Rhode Island charges remained outstanding.

---

between Bido's 1991 arrest in New York City and his 2005 extradition to Rhode Island violated his speedy-trial rights; (3) that a search of his Rhode Island apartment shortly after Confessor's murder, to which Colon had consented, was unconstitutional; (4) that the state coerced Colon to testify against him by threatening her with criminal charges and the prospect of taking away her children if she refused to testify; and (5) that Bido's defense counsel was ineffective in numerous respects. Despite raising these five claims in his pro se application, in this appeal Bido solely focuses on the denial of his allegation of ineffective assistance of counsel based on the failure to move for dismissal of the indictment on speedy-trial grounds. We therefore deem all of Bido's other claims waived and will not discuss them in this opinion. See Catucci v. Pacheco, 866 A.2d 509, 515-16 (R.I. 2005) (explaining that a party waives an issue when it fails to brief or otherwise argue the issue before this Court).

However, on cross-examination, he admitted that, when he was arrested in 1996,[3] he was advised of an outstanding warrant in Rhode Island for the Confessor murder; he insisted that a New York judge informed him then that the Rhode Island case was closed. Additionally, the state established that, in 2005, Bido fought extradition from New York and that he declared in an affidavit that in 1996, when he was arrested in New York, he knew that the Rhode Island charges were pending.

Bido also testified that he lived openly in New York City from 1991 to 2005, and he explained that, if "[Rhode Island authorities] had wanted me to come to Rhode Island[,] [t]hey could have come to get me at my house. I've never been hiding." He described the several locations where he lived during this time[4] and stated that he had held a New York-issued driver's license and had held various jobs during this period, including a stint as a licensed taxicab driver. Bido referred to a statement from the Social Security Administration that showed the income he reported in the years between 1993 and 2006.

Bido further testified that between 1991 and 2005 he was no stranger to New York's legal system. He explained that he was arrested "[s]everal times" during this period.[5] Bido testified that each time he was arrested he provided his name and address to authorities.

---

[3] The record reveals that Bido was arrested in 1996 for running a red light and on suspicion of driving while intoxicated.

[4] All told, Bido had six addresses over the fourteen years between 1991 and 2005: his mother-in-law's house, at which he lived immediately after his release in 1991; an apartment in his own name; three different apartments within one apartment complex, where he lived with Colon; and another address at which he occasionally lived with his girlfriend. With the exception of one apartment, none of these locations were held in Bido's name.

[5] The state stipulated that Bido was in the custody of New York authorities on: May 8, 1996; again on February 12, 1999 until May 5, 2000; once more between February 17, 2005 and March 11, 2005; and, finally, from May 24, 2005 to August 5, 2005.

Additionally, Bido testified that he appeared several times in the New York City Family Court for child-support proceedings.

Finally, Bido testified that, after he was extradited to Rhode Island in 2005, he gave his defense counsel all the paperwork that had been prepared by his New York attorney, including a letter from his attorney that indicated that, based on the delay, a motion for a speedy trial should be filed on Bido's behalf. Bido's trial counsel testified that, based on his twenty-three years as a public defender, it was "unusual" for a defendant to stand trial on an indictment issued fourteen years earlier. Nevertheless, defense counsel admitted that he had not moved, either orally or in writing, to dismiss the indictment on speedy-trial grounds.

Morowitz testified for the state and indicated that, after Bido's July 1991 arrest, he drove to New York with two police officers to interview Bido about Confessor's murder. Although Bido initially indicated a willingness to cooperate with the state in its investigation of the murder, he quickly proved to be uncooperative, at which point Morowitz told him that he would be charged with murder. Bido was indicted in July 1992; Morowitz was unable to explain how the case was handled thereafter, other than to say that another member of the attorney general's staff would have handled Bido's extradition.

In a bench decision, the trial justice, who also presided at Bido's trial, denied the application. In reaching his conclusion, the trial justice first addressed Bido's speedy-trial claim, using the four-factor speedy-trial framework established by the United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 530 (1972), and adopted by this Court in Tate v. Howard, 110 R.I. 641, 647-48, 296 A.2d 19, 23-24 (1972). That framework consists of an evaluation of the following factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. Barker, 407 U.S. at

530; Tate, 110 R.I. at 648, 296 A.2d at 23-24. The trial justice found that the delay in this case was presumptively prejudicial, thereby triggering an analysis of the remaining Barker factors.

The trial justice next remarked that the issue "probably critical to the case" was the reason for the delay. The trial justice found that from Bido's getaway on the day of the murder, which the trial justice termed "classic flight," to his eleventh-hour request for appointment of new counsel—on the eve of trial and after a plea bargain was rejected—over fifteen years later, Bido doggedly had pursued a strategy of avoiding a trial on the indictment. The trial justice further found that, despite being aware of the Rhode Island charges after his arrests in 1991 and again in 1996, Bido refused voluntarily to return to Rhode Island. The trial justice placed particular emphasis on the fact that, contrary to his testimony that he first learned that the indictment was pending in 2005, Bido contested extradition in 2005 and declared in his affidavit that, after his 1996 arrest, he knew that the charges were pending and nevertheless refused to return to Rhode Island.

The trial justice also found it significant that, after his July 1991 arrest, Bido married Colon; he characterized this marriage as an effort to prevent Colon from testifying against him. Additionally, although the trial justice recognized that Bido remained in New York City until 2005, when he was extradited to Rhode Island, he found that Bido worked many jobs and lived in several locations, most of which were in the names of his wife or girlfriend. The trial justice also noted that Bido fought extradition in 2005 and found this to be further evidence of a deliberate effort to avoid returning to Rhode Island. Finally, the trial justice observed that, at the "last minute," Bido moved for a continuance of his trial to obtain new counsel, shortly after he learned that Colon was on her way to Rhode Island to testify against him.

Most significantly, the trial justice found that Bido's testimony at the postconviction-relief hearing was not credible. The trial justice explained that, notwithstanding the testimony of several trial witnesses that Bido was in the state at the time of Confessor's murder, Bido insisted that he was not in Rhode Island at that time. The trial justice declared, "[T]here's no question in my mind that [Bido] was not truthful with me" when he testified at the postconviction-relief hearing.

The trial justice held that the primary responsibility for the complained-of delay in this case was attributable to Bido. Although the trial justice recognized that "[t]here's no question that [the state] could have done a better job" processing this case, he nevertheless was "convinced that the primary paramount cause of this delay was the conduct of Mr. Bido."

The trial justice briefly discussed the prejudice factor of the speedy-trial framework. He acknowledged that Bido had identified two specific instances of prejudice allegedly flowing from the delay: (1) the 1991 notes of a police officer who testified at Bido's trial had been lost; and (2) Bido was unable to locate a potential witness or suspect in Confessor's murder, a man he referred to as "Giovanni." However, the trial justice concluded that "the reason for the delay is clearly and primarily attributed to [Bido] and as a result of that any prejudice that he might suffer is of his own doing."

The trial justice concluded that Bido's speedy-trial claim was without merit. Accordingly, the trial justice found that Bido's allegation of ineffective assistance of counsel similarly was doomed, stating that "because [Bido] was solely responsible for the delay, one cannot attribute to his attorney any failure to be effective for not raising" the speedy-trial issue. Bido timely appealed.

**Standard of Review**

The statutory remedy of postconviction relief set forth in G.L. 1956 chapter 9.1 of title 10 is "available to any person who has been convicted of a crime and who thereafter alleges either that the conviction violated the applicant's constitutional rights or that the existence of newly discovered material facts requires vacation of the conviction in the interest of justice." Sosa v. State, 949 A.2d 1014, 1016 (R.I. 2008) (quoting Pierce v. Wall, 941 A.2d 189, 192 (R.I. 2008)). When reviewing the grant or denial of postconviction relief, the hearing justice's factual findings and credibility determinations will be upheld "absent clear error or a determination that the hearing justice misconceived or overlooked material evidence." Lynch v. State, 13 A.3d 603, 605 (R.I. 2011) (quoting Rodrigues v. State, 985 A.2d 311, 313 (R.I. 2009)); see Rice v. State, 38 A.3d 9, 17 n.11 (R.I. 2012) ("This Court will not disturb * * * credibility determinations by a postconviction-relief hearing justice unless the [applicant] 'demonstrate[s] by a preponderance of the evidence that the [hearing] justice was clearly wrong.'" quoting Fontaine v. State, 602 A.2d 521, 526 (R.I. 1992)). At the same time, we review "questions of fact concerning infringement of constitutional rights, and mixed questions of law and fact with constitutional implications, de novo." Sosa, 949 A.2d at 1016; see also Lynch, 13 A.3d at 605. When conducting our de novo review, however, we nonetheless accord "great deference" to the hearing justice's "[f]indings of historical fact, and inferences drawn from those facts." Hazard v. State, 968 A.2d 886, 891 (R.I. 2009) (quoting Gonder v. State, 935 A.2d 82, 85 (R.I. 2007)).

**Analysis**

Bido's sole contention on appeal is that the trial justice erred in denying his postconviction-relief claim of ineffective assistance of counsel. In assessing claims of ineffective assistance of counsel, we employ the familiar two-pronged standard enunciated in

Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Neufville v. State, 13 A.3d 607, 610 (R.I. 2011); Lynch, 13 A.3d at 605. First, the applicant must establish that counsel's performance was constitutionally deficient; "[t]his requires [a] showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed * * * by the Sixth Amendment." Neufville, 13 A.3d at 610 (quoting Powers v. State, 734 A.2d 508, 522 (R.I. 1999)). In determining whether this first hurdle has been surmounted, we scrutinize the performance of counsel in a "highly deferential" manner, Lynch, 13 A.3d at 606, affording counsel "a strong presumption that counsel's conduct falls within the permissible range of assistance." Neufville, 13 A.3d at 610. "Second, the applicant must show that he was prejudiced by this deficient performance." Lynch, 13 A.3d at 605. To satisfy this prong, the applicant must "prove, by a 'probability sufficient to undermine confidence in the outcome[,]' that 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. at 605-06 (quoting Strickland, 466 U.S. at 694).

The primary focus of Bido's allegation of ineffective assistance of counsel in Superior Court—and his sole focus on appeal—was defense counsel's failure to seek dismissal of the indictment based on the denial of his right to a speedy trial. Therefore, before we can decide whether Bido has met either prong of the Strickland standard, we first evaluate the merits of Bido's speedy-trial claim. It is to this matter that we now turn.

## I

## Speedy Trial

A criminal defendant's right to a speedy trial emanates from the Sixth Amendment to the United States Constitution and article 1, section 10 of the Rhode Island Constitution. State v. Oliveira, 961 A.2d 299, 317 (R.I. 2008). As the United States Supreme Court has observed:

- 10 -

> "The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." United States v. Loud Hawk, 474 U.S. 302, 311 (1986) (quoting United States v. MacDonald, 456 U.S. 1, 8 (1982)).

To assess the merits of a speedy-trial claim, this Court uses Barker's four-factor framework. State v. Crocker, 767 A.2d 88, 91 (R.I. 2001). We examine "(1) the length of the delay, (2) the reason for delay, (3) the defendant's assertion of his [or her] rights, and (4) the prejudice to the accused." Id. (quoting State v. Austin, 731 A.2d 678, 683 (R.I. 1999)). In conducting our analysis, we carefully weigh "each factor, with no single one being wholly dispositive." Oliveira, 961 A.2d at 317 (quoting State v. DeAngelis, 658 A.2d 7, 11 (R.I. 1995)). Under this framework, we are convinced that Bido's speedy-trial claim is without merit.

The first factor in the framework "is a threshold consideration that triggers review of the remaining factors only if the delay is long enough to be considered 'presumptively prejudicial.'" Crocker, 767 A.2d at 91-92 (quoting Austin, 731 A.2d at 683). "We have held that the line that demarks the 'presumptively prejudicial' boundary may be drawn at twelve months." State v. Powers, 643 A.2d 827, 831 (R.I. 1994). Bido contends, and the state concedes, that for speedy-trial purposes the delay in this case—over fourteen years, from Bido's arrest in July 1991 to the commencement of Bido's trial in May 2006—is presumptively prejudicial, thereby triggering the remainder of the Barker analysis.

The second Barker factor requires us to determine the reason for the delay. Oliveira, 961 A.2d at 317. In most cases, each side bears at least some responsibility for pretrial delay. Austin, 731 A.2d at 684; Powers, 643 A.2d at 831. This case is no exception. Resolution of the second factor requires us to "balance the culpability of the parties in causing the delay." Austin,

731 A.2d at 684 (quoting Powers, 643 A.2d at 831); see also Vermont v. Brillon, 556 U.S. 81, 90 (2009) ("[I]n applying Barker, we have asked 'whether the government or the criminal defendant is more to blame for th[e] delay.'" quoting Doggett v. United States, 505 U.S. 647, 651 (1992)).

In determining each party's relative responsibility for the delay, we remain mindful that "[d]ifferent reasons for delay are assigned different weights." Austin, 731 A.2d at 683; see also Powers, 643 A.2d at 831. With respect to the state's responsibility, at one end of the culpability spectrum lies "intentional attempts to delay trial to gain a tactical advantage over a defendant[, which] weigh heavily against the prosecution." Oliveira, 961 A.2d at 317. At the other extreme, we recognize that "pretrial delay is often both inevitable and wholly justifiable," Doggett, 505 U.S. at 656, and that "a valid reason, such as a missing witness, should serve to justify appropriate delay." Powers, 643 A.2d at 831 (quoting Barker, 407 U.S. at 531). Between these poles, "official negligence in bringing an accused to trial occupies the middle ground." Doggett, 505 U.S. at 656-57. "Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." Id. at 657.

Finally, with respect to a defendant's responsibility for the delay, a criminal defendant is not entitled to have things both ways; the accused "cannot take advantage of a delay for which he or she is responsible, whether caused by action or inaction on his or her part, and that factor will weigh against him or her in the balance." Oliveira, 961 A.2d at 317; see also Brillon, 556 U.S. at 90 ("[D]elay caused by the defense weighs against the defendant[.]"). The Supreme Court has explained that, "[j]ust as a State's 'deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the [State],' * * * so too should a defendant's

deliberate attempt to disrupt proceedings be weighted heavily against the defendant." Brillon, 556 U.S. at 93-94 (quoting Barker, 407 U.S. at 531).

In this case, the trial justice, after finding that Bido was not a credible witness, concluded that Bido's conduct was the primary cause of the complained-of delay. This finding largely rested on the fact that, in his 2005 affidavit, Bido acknowledged that he was made aware of the indictment in 1996 but nonetheless refused voluntarily to return to this jurisdiction to face the charges. Additionally, the trial justice deemed Bido's decision to fight extradition in 2005 to be consistent with his overall efforts to avoid standing trial on the indictment. The trial justice's conclusion is fully consistent with this Court's speedy-trial jurisprudence. See, e.g., State v. Werner, 831 A.2d 183, 195 (R.I. 2003) (affirming the denial of the defendant's speedy trial claim because, among other reasons, the trial justice correctly referred to the fact that the defendant "for a time had refused to cooperate in the attempt by Rhode Island authorities to have him transferred to Rhode Island pursuant to the [Interstate Agreement on Detainers Act]"); Crocker, 767 A.2d at 91-94 (affirming the trial justice's determination that the defendant's conduct was the primary cause of the delay in a case in which the defendant remained absent from the jurisdiction for sixteen years, despite knowing of the existence of an outstanding arrest warrant, and did not voluntarily return to Rhode Island); see also United States v. Manning, 56 F.3d 1188, 1195 (9th Cir. 1995) ("If the delay can be attributed to Manning himself, he will be deemed to have waived his speedy trial rights entirely. * * * Manning cannot avoid a speedy trial by forcing the government to run the gauntlet of obtaining formal extradition and then complain about the delay that he has caused by refusing to return voluntarily to the United States."); United States v. Thirion, 813 F.2d 146, 154 (8th Cir. 1987) ("Thirion attempts to attribute the ninety-two-day delay between his arrest in Monaco and his arraignment in the United States to the government.

Thirion contends that he attempted to waive extradition and return to the United States. His contention is supported only by his own testimony and is inconsistent with his flight to Europe, decision to remain abroad when he learned of the indictment against him and his strong reliance on the terms of the extradition. Absent evidence of any formal waiver of extradition, we are unwilling to attribute to the government any delay caused by formal extradition proceedings initiated in compliance with the treaty.").

In Crocker, 767 A.2d at 92-94, the defendant was brought to trial sixteen years after he was indicted. Nonetheless, the trial justice found, and we agreed, that the "primary reason" for the delay was "that [the defendant] deliberately failed to appear for his pretrial conference date after receiving notice to do so. Thereafter, he remained outside this jurisdiction on the lam from an outstanding arrest warrant that he knew the court had issued after he failed to appear for his scheduled 1981 trial." Id. at 92.

In this case, Bido, like the defendant in Crocker, purposefully remained outside the state's jurisdiction despite actual knowledge of the charges pending against him. Beginning with his "classic flight" on the day of Confessor's brutal murder, Bido took several steps to avoid facing trial: he refused Morowitz's offer to cooperate against the other perpetrators and was informed that he would be prosecuted for murder; he married Colon in an apparent attempt to prevent her from testifying against him; he lived at an assortment of New York addresses, almost all of which were in someone else's name; he refused to return to Rhode Island after his 1996 arrest when he learned that the indictment was pending; he fought extradition to Rhode Island in 2005; and, on the eve of trial, he sought a continuance to secure new counsel after learning that Colon was on her way from New York to testify against him. These facts provide ample support

for the trial justice's conclusion that the delay in this case largely can be attributed to Bido's own avoidance efforts.

To be sure, the state is not blameless; fourteen years elapsed between Bido's indictment and his trial, and the state has offered scant explanation for this delay, beyond simply pointing to Bido's conduct. Indeed, the trial justice recognized that "[t]here's no question that [the state] could have done a better job," and the state, for its part, concedes that the pace of Bido's prosecution hardly was exemplary. Nevertheless, the trial justice found that the lion's share of the responsibility for the delay rested at Bido's feet. We agree with this conclusion.

In <u>Crocker</u>, 767 A.2d at 91-92, the state, as a result of apparent oversight, failed to execute an outstanding arrest warrant for the defendant for a period of sixteen years, despite knowing of an out-of-state address for the defendant. We nonetheless affirmed the trial justice's finding that the defendant, by virtue of his willful and deliberate evasive actions, was more culpable than the state for causing the delay. <u>Id.</u> at 93-94. We explained that:

> "The mere fact that the state negligently allowed [the defendant] to get away with his evasive conduct for so many years does not excuse him from intentionally refusing to appear for his pretrial conference in the first place and then, for the next sixteen plus years, failing to return to Rhode Island to face the criminal charges that 'he knew, * * * or should have known' were still pending against him." <u>Id.</u> at 94.

Our reasoning in <u>Crocker</u> fully applies to this case: although the state was negligent in failing to pursue Bido once he fled Rhode Island, that negligence does not excuse Bido's pattern of evasive conduct. The trial justice gave full consideration to the relative responsibility of the

- 15 -

state and Bido for this long period of delay.  We agree with the trial justice's apportionment of culpability.[6]  The second Barker factor therefore weighs against Bido.

Turning to the third factor—the defendant's assertion of the right to a speedy trial—"[w]hen assessing a defendant's assertion of his [or her] right to a speedy trial, this Court looks for actions sufficiently aggressive to constitute the equivalent of 'banging on the courthouse doors.'"  Crocker, 767 A.2d at 94 (quoting Austin, 731 A.2d at 684).  Bido's conduct in this case in no way approaches pounding, or even tapping, on the courthouse doors; in fact, Bido consistently sought to avoid prosecution.

Bido contends that he cannot be faulted for failing to assert his right to a speedy trial because he had "no reason after his release in 1991 to expect that the [s]tate intended to prosecute him."  This argument contradicts the findings of the trial justice that in 1991 Morowitz told him that he would be prosecuted for murder and that in 1996 he again was made aware that the Rhode Island charges were pending.  The facts, as found by the trial justice, establish that Bido had actual knowledge of the Rhode Island charges for at least some, if not all, of the long period of delay.  This fact is significant when assessing the third Barker factor.

In Crocker, 767 A.2d at 94, we held that:

> "[A] legally prudent person who faces criminal charges and who has deliberately avoided a trial date and ignored an outstanding arrest warrant is well advised to assert his or her right to a speedy trial—if he or she wishes to preserve that right[—by] loudly knocking on the courthouse door and demanding a speedy trial. This is especially true if a defendant is on notice that a warrant for his or her arrest is outstanding."

---

[6] At one point in his bench decision, the trial justice remarked that Bido was "solely responsible" for the delay.  However, the trial justice noted that "[t]here's no question that [the state] could have done a better job" in processing the case, and he repeatedly explained that Bido's conduct was the "primary" or "paramount" reason for the delay.  We therefore agree with so much of the trial justice's decision that allocates some responsibility for the delay to the state, while finding that most of that responsibility rests with Bido.

This Court rejected "Crocker's 'no news is good news' stance, pursuant to which, he says, he just assumed after a while that the charges no longer were pending." Id. at 95. Similarly, in Doggett, 505 U.S. at 650, a case involving a delay of more than eight years between indictment and arrest, the Supreme Court remarked that, had the defendant known of his indictment during that time, "Barker's third factor, concerning invocation of the right to a speedy trial, would be weighed heavily against him." Id. at 653.

Doggett and Crocker therefore compel the conclusion that the third factor must weigh heavily against Bido, because the facts found by the trial justice establish that Bido knew of the pending Rhode Island charges and nevertheless failed to demand a speedy trial or otherwise assert that right in any way.

Finally, with respect to the fourth factor in the speedy-trial framework—prejudice to the defendant—the Supreme Court has "identified three types of prejudice that the right to a speedy trial was designed to prevent: oppressive pretrial incarceration, anxiety and concern of the defendant, and impairment of the ability to present a defense." Oliveira, 961 A.2d at 319. Of the three, "[t]he latter concern is the most important 'because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" Id. (quoting DeAngelis, 658 A.2d at 12). Furthermore, the Supreme Court has recognized that "affirmative proof of particularized prejudice is not essential to every speedy trial claim" because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." Doggett, 505 U.S. at 655.

Here, Bido makes no assertion that the first two types of prejudice apply in his case. Apart from the approximately four months he spent confined in New York City after his July 1991 arrest, Bido was not confined on this charge again until 2005. Therefore, any oppressive

pretrial confinement is entirely absent from this case. Additionally, Bido hardly can assert that he suffered much anxiety and concern as a result of these pending charges; he testified that he lived and worked in New York purportedly unaware, until 2005, of the ghost of Confessor's murder. Thus, the only type of prejudice Bido plausibly can claim is the impairment of his ability to present a defense.

In the course of this case,[7] Bido has identified two instances of specific prejudice: (1) the 1991 notes of a testifying police officer had been lost; and (2) a possible witness or suspect in the Confessor murder—a man referred to only as "Giovanni"—could not be located. Additionally, Bido argues that the sheer length of delay in this case justifies a presumption of prejudice. We are unconvinced.

With respect to the lost police notes, Bido has given us nothing to suggest how the loss of the notes caused him any prejudice. The police officer testified at trial and was subjected to extensive voir dire on Bido's motion to suppress his statements, and the officer testified that he vividly remembered the circumstances of Bido's arrest and interview in New York. Bido, 941 A.2d at 834-37. During the suppression hearing, Bido "put forth no evidence that contradicted [the officer's] account of the circumstances that preceded [Bido's] statement." Id. at 836. Bido has similarly failed to provide us with any indication of how the missing notes caused him any

---

[7] On appeal, Bido equates the "prejudice to the accused" factor of the speedy-trial framework to the prejudice prong of the Strickland standard. These inquiries, while both employing the term "prejudice," are very different: the fourth Barker factor examines how the delay has prejudiced the accused in terms of the three specific types of prejudice and any presumptive prejudice that may arise from excessive delay, Doggett v. United States, 505 U.S. 647, 654-56 (1992), while the prejudice prong of the Strickland inquiry examines whether the allegedly constitutionally deficient performance of counsel caused the result of the proceeding to be different from what it would have been if counsel's performance was within the bounds of what is constitutionally permissible, Lynch v. State, 13 A.3d 603, 605-06 (R.I. 2011). However, notwithstanding Bido's error, we briefly address the types of prejudice alleged below by appointed counsel and mentioned by Bido on appeal under his discussion of the first Barker factor.

prejudice. With respect to the infamous "Giovanni,"[8] we are troubled by the wholly undeveloped and unsubstantiated nature of Bido's argument that, because of the delay, he cannot now locate a purportedly crucial witness—or perhaps even a potential suspect—whom, after all, he can identify only on a first-name basis. Cf. Crocker, 767 A.2d at 95 ("Crocker never presented evidence that would lead us to believe that any of his proposed character witnesses—all of whom allegedly were unavailable or unable to testify at his 1997 trial because of the delay—were of critical importance to his case. In fact, Crocker never took advantage of the trial justice's offer to give him 'a reasonable amount of time' to produce 'either the original witnesses' or 'more contemporary or perhaps more probative witnesses,' thereby further indicating to the trial court and to us that, in all likelihood, no material character witnesses existed.").

Moreover, although the trial justice acknowledged Bido's bare contentions of prejudice, he concluded that, because Bido's conduct was the primary reason for the delay, any prejudice that might have been suffered must be laid at his feet. We deem this conclusion to be correct. See Crocker, 767 A.2d at 96 (explaining, in the course of rejecting the defendant's speedy-trial claim, that "Crocker, unlike the defendant in Doggett, intentionally avoided returning to this jurisdiction to face the charges that he knew or should have known were still pending against him—and thus was himself largely responsible for the delay in his eventual trial"). Therefore, we weigh the fourth factor against Bido.

After carefully assaying each Barker factor, we are convinced that any speedy-trial claim that Bido might have raised at his trial would have been without merit.

---

[8] While the transcript below—as well as Bido on appeal—refers to this man as "Giovanni," Bido's memorandum supporting his amended application for postconviction relief refers to this man as "Jovanny" and "Shorty." We also note that, when he was arrested in 1991, Bido told New York authorities that he had loaned his car to a friend named "Yovanny" knowing that Yovanny would be using the vehicle in a robbery. Bido, 941 A.2d at 827. Thus, though not clear, we will consider that "Giovanni" and "Yovanny" are one and the same.

## II

### Ineffective Assistance of Counsel

Having evaluated the merits of Bido's underlying speedy-trial claim, we now turn to Bido's allegation of ineffective assistance of counsel. We are convinced that the trial justice properly denied this claim.

Because our analysis leads us to conclude that Bido's speedy-trial claim would not have been successful, defense counsel's failure to move for dismissal of the indictment on speedy-trial grounds was not constitutionally deficient. Moreover, even if defense counsel's performance fell below an objective standard of reasonableness, Bido's claim cannot surmount the prejudice prong of Strickland; because Bido's speedy-trial contention, if raised, ultimately would have proven unsuccessful, he cannot show that the result of the proceeding against him would have been different. Accordingly, the trial justice's denial of Bido's allegation of ineffective assistance of counsel was correct.

### Conclusion

For the reasons articulated above, we affirm the judgment below. The papers may be remanded to the Superior Court.

Justice Indeglia did not participate.



**TITLE OF CASE:**  Nelson Bido v. State of Rhode Island.

**CASE NO:**  No. 2011-77-Appeal.
(PM 09-4622)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  December 10, 2012

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

**WRITTEN BY:**  Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**  Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Gilbert V. Indeglia

**ATTORNEYS ON APPEAL:**

For Applicant:  Susan B. Iannitelli, Esq.

For State of Rhode Island:  Aaron L. Weisman
Department of Attorney General